WATKINS MOTOR LINES,
INC., Petitioner,

v.

INTERSTATE COMMERCE COMMISSION and United States of
America, Respondents.

No. 80–5289
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit B

April 9, 1981.

Paul M. Daniell, Atlanta, Ga., for peti-
tioner.

John J. Powers, III, Kenneth P. Kolson, Attys., U. S. Dept. of Justice, Richard A. Allen, General Counsel, Cecelia E. Higgins, Deputy Gen. Counsel, ICC, Washington, D. C., for respondents.

Maurice F. Bishop, Birmingham, Ala., for Osborn Transp.

Before GODBOLD, Chief Judge, KRAV-ITCH and HATCHETT, Circuit Judges.

KRAVITCH, Circuit Judge.

Watkins Motor Lines, Inc. petitions this court to set aside respondent Interstate Commerce Commission's (ICC) order granting Osborn Transportation, Inc. authority to transport general commodities between Los Angeles and seven southeastern states. Petitioner maintains that the order was arbitrary, capricious, and unsupported by substantial evidence and should be set aside under 5 U.S.C. § 706. For the reasons given below, we affirm in part and reverse and remand in part.

## I. *Prior Proceedings*

In September of 1978, Osborn Transportation, Inc., a motor common carrier, applied to the ICC for authority to transport commodities between Seattle and Tacoma, Washington, and Los Angeles, California, on the one hand, and, on the other, points in seven southeastern states,[1] restricted to the transportation of commodities having a prior or subsequent movement by water.

The ICC referred the application to an administrative law judge (ALJ), who, after a hearing, granted the full authority applied for. Petitioner, a protesting carrier, filed exceptions, challenging only that portion of the ALJ's decision which granted authority between Los Angeles and the seven southeastern states. In February of 1980, the ICC affirmed the ALJ's decision, adopting his statement of facts and conclu-

sions. On April 10, 1980, petitioner filed with this court a petition for review. Osborn was granted permission to intervene.

The focus of the dispute before this court is the significance of the testimony of Grindrod, the traffic analyst for the Harbor Department of Los Angeles, before the ALJ. Osborn relied primarily on Grindrod's supporting testimony. His job entails assuring that Los Angeles provides common carrier services competitive with those available at other ports. Thus, he is knowledgeable on the needs of shippers.

Grindrod testified to the current and future increased need for motor carriage of "all types of commodities" (but "predominantly consumer goods, . . . bicycles and tricycles and motorcycles and automobiles to a great extent"), which arrive at Los Angeles by water to be transported to the Southeast. He also testified that there would be a need for "mini-bridge service" (transportation from a port on one coast to a port on the other coast) to and from five port cities,[2] each in one of the seven states involved in the application. He explained that the need for carriage to those five cities would grow, primarily due to the increased tolls and uncertain future of the Panama Canal. He recognized that there was no current demand for such service because of cheaper rail transportation, but he felt this would change, apparently because the tremendous demand could not be handled by rail alone and because of motor carriers' superior capacity for in-transit stops.

## II. *The Applicable Law*

On July 1, 1980, Congress in the Motor Carrier Act of 1980, amended the section, 49 U.S.C. § 10922(a), which provides the standards the ICC is to use in deciding whether to grant common carrier authority. Thus, in reviewing this order, we must determine the applicable law. Prior to July 1, 1980, § 10922(a) read:

---

1. The states are Alabama, Florida, Georgia, Kentucky, North Carolina, South Carolina, and Tennessee.

2. The cities are: Charleston, South Carolina; Savannah, Georgia; Miami and Jacksonville, Florida; and Mobile, Alabama.

(a) Except as provided in this section and Section 10930(a) of this title, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II or III of chapter 105 of this title as a motor common carrier or a water common carrier, respectfully, if the Commission finds that—

(1) The person is fit, willing and able—

(a) to provide the transportation to be authorized by the certificate; and

(b) to comply with this sub-title and regulations of the Commission; and

(2) The transportation to be provided under this certificate is or will be required by the present or future public convenience and necessity.

The current version amended subsection (a) by inserting "of passengers" after "motor common carrier." A new subsection (b), which would control the case before us if the new law were to apply, was also inserted. It provides in relevant part:

(b)(1) Except as provided in this section, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title as a motor common carrier of property if the Commission finds—

(A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and regulations of the Commission; and

(B) on the basis of evidence presented by persons supporting the issuance of the certificate, that the service proposed will serve a useful public purpose, responsive to a public demand or need;

unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity.

(2) In making a finding under paragraph (1) of this subsection, the Commission shall consider and, to the extent applicable, make findings on at least the following:

(A) the transportation policy of section 10101(a) of this title; and

(B) the effect of issuance of the certificate on existing carriers, except that the Commission shall not find diversion of revenue or traffic from an existing carrier to be in and of itself inconsistent with the public convenience and necessity.

(3) The Commission may not make a finding relating to public convenience and necessity under paragraph (1) of this subsection which is based upon general findings developed in rulemaking proceedings.

The ICC and petitioner agree that the old § 10922(a) (hereinafter referred to as the "old law"; the amended statute is referred to as the "new law") should apply since the Commission's decision was issued prior to the effective date of the 1980 Act. Intervenor Osborn contends that the new law is applicable, citing *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) (award of attorney's fees), which this circuit has recently interpreted to require the application of a new statute to "cases pending on the date of [its] enactment ... unless manifest injustice would result, or there is a statutory directive or legislative history to the contrary." *Corpus v. Estelle*, 605 F.2d 175, 180 (5th Cir. 1979) (award of attorney's fees).

■ We need not discuss the question of manifest injustice,[3] because for the reasons

---

3. *Bradley* noted three main factors which must be considered to determine if there is manifest injustice. In summary form they are: "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in law upon those rights." *Bradley* at 696, 94 S.Ct. at 2006. Numerous courts have "simplified" the *Bradley* test by making retroactivity turn on whether the new statute affects antecedent rights or only proce-

articulated below we hold Congress did not intend appellate courts to apply the Motor Carrier Act of 1980 to matters which, on July 1, 1980, had been decided by the ICC.

Under "Congressional Findings" in the note to 49 U.S.C. § 10101, Congress "finds . . . that legislative and resulting changes should be implemented with the least amount of disruption to the transportation system consistent with the scope of reforms enacted." The ICC recognized that it would be highly "disruptive" to the industry if all pending cases required new applications, new opportunities for protest, and new preparation by the ICC. 45 Fed.Reg. 45538 (1980). At the same time the ICC implied that but for the "Congressional Finding," *Bradley* would mandate application of the new law. The ICC's solution, under its interim rules (effective July 3, 1980), which have the force of law, was to apply the old procedural and substantive law to applications pending on July 1, 1980, but to allow an applicant who was eventually denied authority under the old substantive law an opportunity for reconsideration

under the new more liberal substantive law. *Id.* at 45537–38. The final rules subsequently issued apply only to applications filed on or after February 9, 1981, and implicitly preserve the interim rule on applications pending on July 1, 1980, by not addressing the subject. *Id.* at 86771.[4] *Cf. Art Pape Transfer, Inc., Extension*, 132 M.C.C. 84 (Sept. 12, 1980) (without mentioning the interim rules which control it in an application proceeding, the ICC provides a slightly different test for the applicability of the new law, but the difference is not relevant to our decision).[5]

This ICC "pending application rule," which interprets and implements the Motor Carrier Act, indicates that we should apply the old law, at least when the authority has been granted. Were we to apply the new law, we would be compelled to remand almost all cases, a result contrary to the ICC policy with respect to applications pending on July 1, 1980.[6] It would be disruptive for parties before an appellate court to be thrust back to the beginning of the application process.[7] By reviewing the grant of

---

dure or remedy. *See, e. g., United States v. Vanella*, 619 F.2d 384, 385–86 (5th Cir. 1980). Although we do not reach this question, it would seem that the *Bradley* factors are still critical, since they give content to vague words such as "procedure."

4. The final rule provides that the interim rules will apply to applications filed between July 3, 1980 and February 9, 1981, so one could argue that the interim rule on "pending applications" (those pending which were filed before July 1, 1980) is no longer in force. Thus, the old law would apply to those applications without any provision for reconsideration under the new law. We decline to adopt this construction. In providing in the final rule that the interim rules would apply to applications filed between July 3, 1980 and February 9, 1981, the ICC was only contemplating the substantive and application procedure rules. If the ICC had meant to change the "pending application" interim rule, it would have done so expressly and would have discussed the rationale of its decision, as it had in the interim rules.

5. Under *Pape*, the test was not when the application was filed, but, with a minor exception, when the modified procedure order was issued to the parties. The rationale given, however, was the same one discussed in the ICC's explanation of the interim rule (*Pape* at 92–95), thus the same one which we rely on for our holding

infra. *Pape* also stated: "Commission decisions will be measured by the courts against the standards of the [new law]." *Pape* at 92. This language is ambiguous dicta which if read broadly to apply in our case would be inconsistent with the analysis in other parts of *Pape*. For example, why would the ICC apply the old law at all if courts were going to review all orders under the new law?

As an aside, the validity of the *Pape* test is further in question; it not only conflicts with the interim rule but also with the subsequently issued final rule which focuses on the date of the filing of the application, not the date of the modified procedure order.

6. One reason we would have to remand is that we could not review any order unless the ICC made the findings required by the new § 10922(b)(2)(A). Even in those rare instances where the ICC made such findings, we could not affirm a denial or reverse a granting without remand, since the applicant would not have had a chance to present evidence meeting the new, more relaxed test.

7. Although the total disruption to the industry would be less than if the new law were applied to matters pending before the ICC because of the larger number pending before the ICC than pending on appeal, the disruption to each of the

authority under the old law, we are reducing this disruption without violating the intent of the new law. Affirming the grant of authority under the old law avoids the disruption of remand and is not inconsistent with the spirit of the new law which generally aims to establish more liberal standards governing the granting of authority. See 45 Fed.Reg. 45537–38 (the ICC used this same reasoning in adopting its interim rules). When we reverse, the ICC will on remand apply the new law, a result which clearly is not manifestly unjust.

We thus review the order before us under the old law.[8]

### III. *Substantive Issues*

Petitioner maintains that Osborn failed to present a prima facie showing of "public necessity" for Osborn's services under 49 U.S.C. § 10922(a) (prior law). Petitioner further claims that even if Osborn did make out such a case, petitioner clearly demonstrated that the harm to the other carriers from a granting of the application would outweigh the benefits; thus, the public interest favored denial of the application. The petitioner correctly points out that if this is so, the case law requires that the application be denied. *See Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *see also Sharron Motor Lines, Inc. v. United States*, 633 F.2d 1115 (5th Cir. 1981).

numerous members who has an appeal pending would be greater. As an aside, it would be somewhat anomalous to apply the new law to the matters pending on appeal, while the ICC continues to process more recent applications under the old law.

8. Although our research does not reveal any case precisely on the retroactivity of the Motor Carrier Act of 1980, we do note that the cases which have reviewed orders after July 1, 1980 have applied the old law. *See, e. g., Sharron Motor Lines, Inc. v. United States*, 633 F.2d 1115 (5th Cir. 1981); *Hunt Transportation, Inc. v. ICC*, 636 F.2d 190 (8th Cir. 1980); *Midwestern Transportation, Inc. v. ICC*, 635 F.2d 771 (10th Cir. 1980). *See also Central Freight Lines, Inc. v. ICC*, 625 F.2d 1012 (5th Cir. 1980)

### IV. *Standard of Review*

Under 5 U.S.C. § 706,[9] an agency decision such as the one before us should be set aside if it is "arbitrary, capricious, . . . [or] unsupported by substantial evidence." If the agency considers the relevant factors and articulates a rational connection between the facts found and the choice made, the decision is not arbitrary or capricious. *Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). Under the substantial evidence test, the decision need not be supported by the weight of the evidence; the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). "[Substantial evidence is] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Refrigerated Transport Co., Inc. v. ICC*, 616 F.2d 748, 751 (5th Cir.1980).

### V. *Discussion*

### A. *Public Necessity—A Prima Facie Case*

The ICC's test under the § 10922(a) standard for public necessity was established in *Pan Am Buslines Operation*, 1 M.C.C. 190 (1936) and has been approved by this court. The factors to be considered are:

(unpublished opinion intimating, but not deciding, that our resolution is correct).

9. Section 706 provides in relevant part:
§ 706 *Scope of review*
. . . The reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute . . . .

1) Whether the new operation or service will serve a useful public purpose, [responsive] to a public demand or need; 2) whether this purpose can and will be served by existing lines or carriers; and 3) whether [this purpose can and will be served by applicant with the new operation or service proposed] without endangering or impairing the operations of existing carriers contrary to the public interest.

*Sharron Motor Lines, Inc. v. United States,* 633 F.2d 1115 (5th Cir. 1981).[10]

Petitioner maintains that Osborn failed to present sufficient evidence of the first and second *Pan Am* factors and thus did not make out a prima facie case of public necessity (the protesting carrier has the burden of proof with respect to the third factor, *see* discussion *infra*). In *John Novak Contract Carrier Application,* 103 M.C.C. 555 (1967), the ICC noted that to make out a prima facie case of public necessity, the applicant should introduce evidence identifying "clearly [1] the commodities [potential shipping clients] ship or receive, [2] the points to or from which their traffic moves, [3] the volume of freight they would tender to applicant, [4] the transportation services now used for moving their traffic, and any deficiencies in existing services." *Novak* at 557. These criteria are not mandatory. *See Refrigerated,* 616 F.2d at 751.

They do, however, provide helpful guidelines. *Refrigerated* (implied). We thus analyze Osborn's proof, i. e., the testimony of Grindrod, the traffic analyst, in light of the four criteria. We begin by examining the proof with respect to the authority from Los Angeles to the seven southeastern states.

Grindrod testified [11] that carriage for all commodities was needed, noting that no lesser authority than "general commodities" (with minor exceptions the authority granted) would suffice. We hold this testimony sufficient under the first *Novak* criterion; the requirement of specifying commodities does not apply when the witness shows an awareness that limited authority is possible but testifies to the need for general authority.

With respect to the second criterion, points shipped to and from, it is not necessary that an applicant demonstrate a public need "with respect to each point for which he seeks authority .... What an applicant must do, however, is to demonstrate 'need at numerous representative points' ...." *Refrigerated,* 616 F.2d at 754. This raises a rebuttable presumption of need throughout the area, which, if unrebutted, the ICC may rely on. *Id.*

10. In a policy statement published October 19, 1979, the ICC changed the *Pan Am* standard. *Ex Parte No. MC-121,* Policy Statement on Motor Carrier Regulation. The statement provides:
    (1) An applicant must demonstrate that the service proposed will serve a useful public purpose, responsive to a public demand or need; and
    (2) The Commission will grant common carrier authority commensurate with the demonstrated need unless it is established by those opposing the application that the entry of a new carrier into the field would endanger or impair the operations of existing common carriers contrary to the public interest.
However, MC-121 does not apply here, since it was specifically limited to applications published on or after November 30, 1979.

11. Although applicants "usually" make out a prima facie case through the testimony of shippers (*see Refrigerated,* 616 F.2d at 751), we find

no precedent or compelling logic in making this a rigid requirement. The traffic analyst had familiarity with the needs of shippers. Furthermore, his testimony is no less credible than that of shippers; both would prefer additional competing carriers. Finally, the analyst testified that he is in touch with shippers weekly as to the carriers available to use, which indicates that his support of Osborn will help Osborn attract business.

We further note but do not rely on the legislative history of the Act of 1980 which makes clear that a traffic analyst's testimony is acceptable. *See* H.R.Rep.No.96-1069, 96th Cong., 2d Sess. at 14. The report is ambiguous, but intimates that this acceptance is not a change from prior law.

Except as explained in note 12 *infra,* we do not, however, agree with the ICC that use of a traffic analyst, who may not have precise shipping figures at his disposal, as a witness relaxes the applicant's burden of proof.

The analyst emphasized the need for carriage to the five port cities. However, these points are not sufficiently representative of cities which are not ports, for the analyst explained that the attraction of the port cities was in large part due to the difficulties with respect to the Panama Canal—the goods carried by motor to the southeastern ports could be put on ships and thus avoid the Panama Canal. But while the representative-point method of proving need in an area is preferred, it is not required when sufficient other evidence is produced. In *Refrigerated* this court implied as much:

> The applicant has made no showing that the supporting shipper's testimony with respect to the need between those two points is representative of a greater need *and* there is simply no evidence from which the Commission could infer the existence of a greater need.

*Refrigerated*, 616 F.2d at 754 (emphasis added).

We hold that the analyst's testimony concerning the tremendously increasing volume of goods needed to be transported from Los Angeles to points throughout the Southeast [12] combined with his testimony with respect to the port cities (which the analyst implies are somewhat representative) is sufficient to satisfy the second *Novak* criterion.

Under *Refrigerated*, the third *Novak* criterion concerning the volume and frequency of freight is satisfied if there is evidence that the volume of freight to be tendered the applicant is "substantial." *Refrigerated*, 616 F.2d at 752. The analyst so testified here.

Petitioner contends Osborn did not meet the fourth *Novak* criterion because Osborn did not show that the existing service was inadequate. Petitioner points to evidence that its service is adequate and that it has in-transit and drop-off capabilities. Petitioner also asserts other carriers serve the same routes.

■ The ICC need not find existing service inadequate in order to grant new authority; authority may be granted if the applicant's service is different or better or provides beneficial competition or fills an anticipated need for additional service. *See Sharron*. Although here there is sufficient evidence with respect to all four factors, we rely primarily on the fourth, anticipated need, as did the ICC in its order and brief.

Grindrod testified extensively as to the necessity for Osborn's services. He emphasized a critical need which Osborn could fill for transportation of consolidated shipments with the accompanying stops in-transit or drop-off service. Thus, the need for Osborn's services is clear.

■ We thus hold that under *Novak* and *Refrigerated* Osborn presented sufficient proof to make out a prima facie case of "public necessity" for authority from Los Angeles to the seven southeastern states. We now turn to the question of whether he satisfied the *Novak* criterion with respect to the authority from the seven southeastern states to Los Angeles. Again, the relevant testimony is that of the traffic analyst. In his written testimony, he does in one instance state that the traffic he is discussing moves to and from Los Angeles and the Southeast. At other times, he uses the phrase "between Los Angeles and the southeast," also suggesting two-way movement, though not clearly. But he refers only to the traffic from Los Angeles to the Southeast in analyzing the current motor carrier service and both present and future needs. This testimony, without more, does not show the need for transportation from the seven southeastern states to Los Angeles; thus, Osborn failed to make out a prima facie case of "public necessity" with

---

12. Although *Novak* seems to require evidence as to specific points, the *Novak* criteria were developed to apply to shipper testimony. Shippers are less able to predict a general increase in shipments to a large area of all commodities by many shippers than a traffic analyst whose business it is to do so. Thus, the testimony of a traffic analyst, who has such broad expertise, that shipments to or from a section of the country will increase should satisfy *Novak* although a shipper's testimony to the same effect might not.

respect to authority to Los Angeles.[13] The exception is authority from the five port cities. Grindrod's testimony can reasonably be read as suggesting that those five cities will have substantially increased need for carriage of all types of commodities to Los Angeles due to the problems with the Panama Canal. Thus, we hold that the portion of the ICC order granting Osborn authority to transport to Los Angeles from any but the named five port cities in the Southeast must be set aside.

### B. *Public Interest*

Once the applicant has made out a prima facie case, the burden shifts to the protesting carrier to demonstrate that the harm to other carriers resulting from granting the application would outweigh the benefits, so that the public would suffer a general decline in service. *See Sharron; see also Bowman.*

Petitioner contends that the public will be harmed due to the overall increase in wasteful deadheading (carrier trips without freight) and delay, the costs of which will be passed on to the shippers. Petitioner shows that it has more freight moving to California from the Southeast than the other way, so that granting Osborn the authority to transport from California will increase petitioner's waste due to deadheading and delays in California awaiting shipments. Petitioner also argues that one of the reasons Osborn was granted authority is no longer viable. Osborn has had to deadhead out of California to Idaho because it lacked authority outbound from California; the ICC cited reduction of this deadhead mileage as a reason for granting Osborn the authority. Petitioner notes that Osborn had recently obtained authority to transport certain commodities out of California and contends that this alone eliminates Osborn's deadhead problem.

Unless the ICC has failed to consider the proper factors (*see Sharron* ) or has made a clear error of judgment, we will not disturb the ICC's exercise of its discretion in evaluating the benefits and harms of granting authority. *See Bowman.* Here, there is no contention that the ICC considered the wrong factors. Petitioner contends only that total waste will be substantially increased. The ICC was entitled to conclude that this will not be so because the predicted general increase in shipments eastward should keep petitioner's deadheading and delays from increasing significantly and because Osborn's recently granted limited authority probably will not be sufficient to eliminate Osborn's deadheading. Furthermore, the ICC could reasonably conclude that the public need for Osborn's carriage service and the benefits from increased competition outweigh a possible slight increase in waste. *See Sharron.* Thus, we see no reason to set aside the order.

### Conclusion

For the foregoing reasons, we affirm the ICC order granting Osborn the authority to operate as a common carrier from Los Angeles to the seven southeastern states and from the five southeastern port cities referred to in note 2 *supra* to Los Angeles. We reverse and remand the order insofar as it grants authority to transport commodities from all other points in the seven southeastern states to Los Angeles. We further direct that on remand the ICC apply the new law to Osborn's application.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

---

**13.** Further support for this holding derives from the unmistakable impression that most of the analyst's testimony focuses on the eastward carriage, leading this court to interpret his use of "between" in a less common manner, i. e., as indicating one-way travel.