**NATIONAL WILDLIFE FEDERATION, ET AL., Plaintiffs-Appellants,**

v.

**John O. MARSH, Secretary of the Army, et al., Defendants-Appellees.**

**No. 83–8193.**

United States Court of Appeals, Eleventh Circuit.

Nov. 27, 1984.

Johnson, Circuit Judge, dissented and filed an opinion.

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

Benjamin H. Terry, Michael Jablonski, Atlanta, Ga., Emmett B. Lewis, Washington, D.C., for plaintiffs-appellants.

Jimmy J. Boatright, M. Theodore Soloman, II, Alma, Ga., James S. Stokes, Atlanta, Ga., for defendants-appellees.

James S. Stokes, Alston & Bird, Sidney O. Smith, Jr., Thomas D. Bever, Atlanta, Ga., Jacques B. Gelin, Dirk D. Snel, Appellate Section, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for City of Alma, Ga., et al.

## ON PETITION FOR REHEARING

(Opinion December 19, 1983, 11 Cir. 721 F.2d 767)

Before KRAVITCH and JOHNSON, Circuit Judges, and LYNNE *, District Judge.

KRAVITCH, Circuit Judge:

In a petition for panel rehearing, some of the appellants, namely individuals of low or moderate income, challenge our conclusion in *National Wildlife Federation v. Marsh*, 721 F.2d 767 (11th Cir.1983), that section 5304(b)(3) of the Housing and Community Development Act (the "HCDA" or "Act"), 42 U.S.C. § 5301 et seq. (1983), does not contain an implicit requirement that a funded project principally benefit low and moderate income persons.

The facts and procedural history of this case are set forth in the panel opinion, but a brief summary may be helpful. In 1968 the City of Alma formulated a plan under the Model Cities Program to revitalize the economy of the community and surrounding area. The plan featured four development projects: an air/rail industrial park, improved water and sewage treatment facilities, a modernized airport and the construction of a recreational lake, referred to as Lake Alma and the subject of over a

decade of litigation. Lake Alma was considered the "urban shaper" of the four.

While funding for the lake under the Model Cities Program was being delayed by litigation over the environmental impact of the project, Congress enacted the HCDA in 1974. Alma sought funding under the Act and was awarded a $2.3 million block grant for fiscal years 1975 through 1977 and another $399,600 for fiscal years 1978 and 1979, but release of the money again was delayed by litigation over the environmental soundness of the proposed development. Finally, in 1982 the Department of Housing and Urban Development informed Alma it would release the funds if certain requirements were satisfied, including compliance with two 1978 HUD regulations, 24 C.F.R. § 570.302(b)(1) and (d),[1] requiring that the project "principally" benefit low and moderate income individuals, i.e., that more than fifty percent of the benefiting public be persons of low or moderate income.

The data Alma submitted to HUD satisfied most of the criteria, but did not quite reach the fifty percent threshold of the principal benefit regulation.[2] Notwithstanding the City's failure to comply with the regulation, the Deputy Secretary of HUD, exercising his authority under 24 C.F.R. § 570.4,[3] waived the principal benefit regulation and released the funds on grounds that to do otherwise would result in undue hardship and would frustrate the purpose of the block grant statute.[4]

Appellants requested a preliminary injunction to prevent the release of funds, which the district court denied. Although we reversed in part and entered a preliminary injunction on other grounds, we affirmed the district court's conclusion that the principal benefit requirement was regulatory only and therefore was subject to

---

1. 24 C.F.R. § 570.302(b)(1) (1983) provides:
   All projects and activities must either principally benefit low- and moderate-income persons, or aid in the prevention or elimination of slums and blight, or meet other community development needs having a particular urgency.
   24 C.F.R. § 570.302(d) (1983) provides in part:
   A project or activity will be considered to principally benefit low- and moderate-income persons if it is designed to meet identified needs of low- and moderate-income persons ... and it meets one of the following standards:
   (1) the project has income eligibility requirements that limit the benefits of the project to low- and moderate-income persons.
   (2) the project does not have income eligibility requirements but the majority of the beneficiaries are low- and moderate-income persons....

2. The Deputy Assistant Secretary of HUD concluded that "the high percentage of low- and moderate-income persons residing in the service area (41.9) and especially in Bacon County (46.2) makes the call a close one."

3. 24 C.F.R. § 570.4 (1983) provides:
   The Secretary may waive any requirement of this part not required by law whenever it is determined that undue hardship will result from applying the requirement and where application of the requirement would adversely affect the purposes of the Act.

4. The Deputy Assistant Secretary concluded that undue hardship would result for a number of reasons. First, Lake Alma was considered one of the cornerstones of the City's development program. Second, the "hold harmless" provisions of the Housing and Community Development Act of 1974 "assured Alma-Bacon County of receiving block grant funding through the fiscal year 1979." Third, not to grant the waiver would, in effect, hold "hostage" $2.3 million awarded under the program prior to the promulgation of HUD's principal benefit regulation in 1978. Fourth, although the Lake Alma project did not definitively meet the requirements of section 570.302(b)(1) and (d), it nearly did so; *see supra* note 2. *See* May 12, 1982, Memorandum to Michael B. Janis, Acting Area Manager, from Donald G. Dodge, Deputy Assistant Secretary of HUD.

The Deputy Assistant Secretary also found that not waiving the requirement would adversely affect the purposes of the block grant statute by frustrating some of the objectives of the Act. He concluded that "it would not allow the grantees to carry out community development activities which are consistent with long-standing comprehensive local and area-wide development planning, which the grantees continue to believe to be relevant. In addition ..., granting the waiver is consistent with the directions of the Housing and Community Development amendments of 1981, as well as the President's goal that local jurisdictions become self-reliant and better able to determine their own community development needs and priorities without federal interference." *Id.*

waiver by HUD under appropriate circumstances. 721 F.2d at 786. Petitioners here ask us to reconsider our conclusion that the fifty percent principal benefit requirement was not an implied condition in 42 U.S.C. § 5304(b)(3). Finding no reason to modify the panel opinion, we deny the petition for rehearing.

One of the issues raised by petitioners, however, merits further discussion. On November 30, 1983, shortly before the opinion in this case was published, Congress amended 42 U.S.C. § 5304(b)(3) to require each grantee to certify that

> [t]he projected use of funds has been developed so as to give maximum feasible priority to activities which will benefit low- and moderate-income families or aid in the prevention or elimination of slums or blight [;], *and* the projected use of funds may also include activities which the grantee certifies are designed to meet other community development needs having a particular urgency because existing conditions pose a serious and immediate threat to the health or welfare of the community where other financial resources are not available to meet such needs, *except that the aggregate use of funds received ... during a period specified by the grantee of not more than 3 years, shall principally benefit persons of low and moderate income in a manner that ensures that not less than 51 percent of such funds are used for activities that benefit such persons during such period;*

42 U.S.C. § 5304(b)(3) (Supp.1984) (emphasis on 1983 amendment). Section 5304 previously required only that "maximum feasible priority" be given to activities that benefit low and moderate income individuals or aid in the prevention or elimination of slums or blight, and, based upon our review of the available legislative history to the HCDA, we held in *National Wildlife v. Marsh, supra,* that Congress rejected a strict percentage floor for use of funds and did not intend that at least fifty percent of the beneficiaries of every funded project should be lower income individuals. 721 F.2d at 779. Petitioners contend that the 1983 amendments, which expressly require that fifty-one percent of the grantee's "aggregate use of funds received" principally benefit persons of low or moderate income, and accompanying legislative history, call for a different result than that reached by the panel.

The 1983 amendments potentially affect the panel opinion in two ways. If applied retrospectively, the revisions would require Alma officials to demonstrate how their project benefits low and moderate income individuals in accordance with the standards set forth therein, particularly 42 U.S.C. §§ 5304 and 5305(c) (Supp.1984).[5] Were we to apply the new law, we would be compelled to remand the case to the district court and HUD to give Alma the opportunity to demonstrate compliance with the new requirements and to give the agency the opportunity to make findings and issue a decision prior to our review. *See Watkins Motor Lines v. I.C.C.,* 641 F.2d 1183 (5th Cir.1981). Alternatively, even if the new law is not applied retrospectively, it may affect our opinion if its provisions and legislative history indicate that our interpretation of the old law was erroneous.

■ A new statute should not be applied retrospectively to cases pending on the date of its enactment if there is a statutory directive or legislative history favoring prospective application or if manifest injustice

---

**5.** 42 U.S.C. § 5305(c)(2) (Supp.1984), as amended, provides:

> In any case in which an assisted activity described in subsection (a) of this section is designed to serve an area generally and is clearly designed to meet identified needs of persons of low and moderate income in such area, such activity shall be considered to principally benefit persons of low and moderate

income if (A) not less than fifty-one percent of the residents of such area are persons of low and moderate income; or (B) in any jurisdiction having no areas meeting the requirements of subparagraph (A), the area served by such activity has a larger proportion of persons of low and moderate income than not less than 75 percent of the other areas in the jurisdiction of the recipient.

would result. *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Corpus v. Estelle*, 605 F.2d 175 (5th Cir.1979). Neither the amendments nor the legislative history indicates congressional intent to apply the new requirements to funds released in prior years under predecessor appropriations bills. Although there is no express statement that the law should be applied only prospectively, there are a number of indirect references to that effect. Most prominent is section 5303, which repeals authorization for funds disbursed in fiscal years 1982 and 1983 and appropriates $3.468 billion in block grants for each of fiscal years 1984, 1985 and 1986. The most logical interpretation is that the changes in application requirements apply only to requests for funding in fiscal years 1984 through 1986 and should not affect grants already released under prior appropriations bills. *See also* amended section 5307(a) (setting forth amount available for disbursement in discretionary fund for fiscal years 1984 through 1986).

This view is supported by other sections that refer to application requirements for fiscal years beginning in 1984 without suggesting that funds released in prior years are affected by the new law. Section 5304(a)(1), for example, which requires the grantee to submit a statement of project objectives and use of block grants in prior years, applies only to "cases beginning in fiscal year 1984." Two other amendments use fiscal year 1983 as a benchmark for determining the qualifications of applicants in future years: section 5305(a)(8) looks to the amount awarded in fiscal year 1983 as a standard for determining the maximum amount of money available in later years for the activities enumerated therein; and section 5302(a)(4) allows a city or county to retain its status as a "metropolitan city" or "urban county" if it enjoyed such a status in 1983. By using 1983 as a starting point, both sections imply that the new provisions pertain only to money appropriated for distribution in fiscal years beginning in 1984.[6]

Additional evidence of congressional intent to affect only block grants applied for and released in fiscal years 1984 through 1986 may be found in the absence of any legislative history even suggesting that applicants for funds released in prior years would have to reapply under the new law. On numerous occasions Congressmen criticized HUD funding of various projects, but no one indicated that the 1983 amendments would require the grantee to requalify for the released funds.

■ Even in the absence of an express legislative directive, under *Bradley* we also may decline to apply a statute retrospectively if manifest injustice will result. A new law will not be applied if it adversely affects a party's vested rights. *Cox v. Schweiker*, 684 F.2d 310, 318–19 (5th Cir. Unit B 1982). HUD approved Alma's first entitlement of over $2.3 million for fiscal years 1975 and 1976 on the condition that the City would complete an environmental impact statement. After completing the EIS, an additional $399,600 was approved for fiscal years 1978 and 1979 on the condition that the City would comply with the newly promulgated HUD principal benefit

---

**6.** Further support may be found in section 110 of the amendments, which appears under the heading "Transition Provisions." Subsection 110(b) states, "The amendments made by this section shall apply only to funds available for fiscal year 1984 and thereafter." Cong.Rec. H10625 (daily ed. Nov. 18, 1983). Both appellants and local appellees have pointed out that the Council for the House Subcommittee for Housing and Community Development, which prepared the original House version of the 1983 amendments, has informed them that the reference in section 110(b) to "this section" was in error, that it should have applied to all amendments made by "this title," and that the error would be corrected in the technical amendments. We are, of course, bound to interpret the statute as enacted, not as it might have been, but this scenario is consistent with our conclusion. It is a plausible construction because section 110(b) makes little sense when applied only to the two technical changes made in subsection 110(a) and not to the remainder of Title I. It becomes even more plausible in light of the fact that the original House bill consisted of only one section (§ 101(a)–(n)). As originally drafted, section 110(b) (then section 101(n)) applied to the entire title, including the new principal benefit requirement. *See* Cong.Rec. H5008 (daily ed. July 12, 1983).

regulations set forth in sections 570.-302(b)(1) and (d). Finally, on May 14, 1982, HUD formally released the money, waiving its principal benefit regulations and finding all other conditions satisfied. At least until this latest suit was filed, Alma reasonably believed it had satisfied all of the statute's requirements and had acquired the authority to spend the released funds. The City's vested interest in the funds is evidenced by its expenditure of over $100,000 in block grant money to date on the EIS and administrative expenses. When HUD released the money in 1982, Alma had a legitimate expectation that it would receive the grant. It would be manifestly unjust to impose different application requirements than those in force when Alma applied for and obtained HUD's release of the block grant funding.

Apart from the question of retrospective application, petitioners maintain the recent legislative history supports their position that Congress initially imposed in section 5304 a strict requirement of fifty-one percent project benefit to low and moderate income individuals. In assessing the relevance of the most recent statements of Congress, we again are mindful that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *National Wildlife Federation v. Marsh*, 721 F.2d at 776 (quoting *Consumer Products Safety Commission v. GTE Sylvania*, 447 U.S. 102, 117, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980) (quoting *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960))). Nevertheless, we perceive the

most recent legislative pronouncement as reenforcing our conclusion that the phrase "maximum feasible priority", as originally enacted in section 5304, does not embody a principal benefit requirement.

We initially observe that the 1983 amendments do not significantly affect the regulations waived by HUD in this case. The amendment to section 5304(b)(3), the provision relied upon most heavily by petitioners, was a legislative reaction to a 1982 HUD proposal that would have eliminated a regulation not at issue here—the seventy-five percent principal benefit requirement for the grantee's "program as a whole," which is codified at 24 C.F.R. § 570.-302(b)(2) and (3).[7] *See* 47 Fed.Reg. 43912 (Oct. 4, 1982). The regulations waived by the Deputy Assistant Secretary in this case were 24 C.F.R. § 570.302(b)(1) and (d), which impose a fifty-one percent principal benefit test on individual "activities" within an overall program of wider scope. HUD's proposed 1982 regulations did not significantly modify the requirements of § 570.-302(b)(1) and (d). *See* 47 Fed.Reg. 43912 and 43932 (Oct. 4, 1982).[8]

The two sets of regulations address two entirely different concerns. Under the block grant statute, a project can be funded if it qualifies under any of three criteria: (1) benefiting low or moderate income families, (2) preventing or eliminating slums or blight, or (3) meeting other urgent community needs. 42 U.S.C. § 5304(b)(3). Sections 570.302(b)(2) and (3) become operative only when a program consists of individual projects qualifying for funds under the latter two criteria. When a "program as a

---

**7.** 24 C.F.R. § 570.302(b)(2) (1983) provides: "Each annual application for funds under this subpart must provide that the applicant's program as a whole shall principally benefit low- and moderate-income persons."

24 C.F.R. § 570.302(b)(3) (1983) provides in part:

An application shall be presumed to principally benefit low- and moderate-income persons, absent substantial evidence to the contrary, where not less than seventy-five percent of the program funds to be available during the three-year period ... shall be used for projects and activities which principally benefit low- and moderate-income persons under

the standards in paragraph (d) of this section ...

**8.** Section 570.901 of the 1982 proposed regulations provides in part: "The following activities, in the absence of substantial evidence to the contrary, will be considered to benefit low and moderate income persons: (i) any activity, other than residential rehabilitation, which is so designed or located that at least a majority of the beneficiaries are low and moderate income persons." 47 Fed.Reg. 43912 (Oct. 4, 1982). *Compare* 24 C.F.R. § 570.302(b)(1) and (d), *supra* note 1.

whole" includes individual projects that did not qualify under the first criterion, compliance with §§ 570.302(b)(2) and (3) ensures that the entire program will benefit low or moderate income persons. Concluding in 1982 that Congress wanted each of the three criteria to be given equal weight in the funding decisions, HUD proposed to remove this regulatory requirement because it elevated one purpose of the Act— benefit to low or moderate income persons—above the other two.[9] Reacting to HUD's proposal, Congress in 1983 demonstrated its disapproval of the agency's interpretation by amending section 5304(b)(3) to require that the "aggregate use of funds" must principally benefit lower income individuals. As amended, section 5304(b)(3) essentially codifies the "program as a whole" requirement that previously existed in regulations 570.302(b)(2) and (3). It does not affect §§ 570.302(b)(1) and (d), which set forth the requirements for funding individual projects under the low or moderate income prong of the Act.

Although amended section 5304(b)(3) does not purport to govern the funding of individual activities within an overall program of wider scope, Congress, in the 1983 amendments, did enact statutory guidelines for determining when a particular activity, such as Lake Alma, qualifies as benefitting low and moderate income individuals. *See* 42 U.S.C. § 5305(c) (Supp.1984). Significantly, however, the guidelines do not impose a rigid rule that to qualify as an activity benefiting persons of lower income the project must serve an area of at least fifty-one percent lower income residents. Under section 5305(c)(2), a project not satisfying a fifty-one percent benefit test will nonetheless qualify for funding if it serves an area comprised of a larger proportion of low and moderate income residents than seventy-five percent of the other areas in the jurisdiction of the recipient. 42 U.S.C. § 5305(c)(2) (Supp.1984). This evidences the belief of the current Congress that each activity need not meet a rigid fifty-one percent principal benefit test.

Despite the lack of legislative history directly addressing the regulations at issue here, and the principal benefit requirement for individual activities within a program embodied therein, the debate over the 1983 amendments may have some relevance. The amendments do manifest congressional concern that HUD was funding or, under the 1982 proposed regulations, could fund projects inconsistent with the purposes of the HCDA. In the broadest context, the legislative history can be construed as demonstrating a general disapproval of HUD's failure to adhere to rigid principal benefit thresholds for both "a program as a whole" and the individual activities within. But even if this were true, the history reveals that Congress was proposing a change in policy and was not merely reiterating or redefining what it had enacted earlier. *See e.g.,* H.R.Rep. No. 123, 98th Cong., 1st Sess. 2 (1983) ("efforts are specifically aimed at *strengthening* the Community Development Block Grant Program") (emphasis added); Cong.Rec. H10501 (daily ed. Nov. 18, 1983) ("the Community Development Block Grant Program is *modified* in a number of ways ....") (emphasis added); *id.* at 10521 ("the principal *policy change* deals with the so-called 'principal benefit' issue") (emphasis added).

It is not a simple task to divine the intended meaning of each provision in complex socio-economic legislation such as the HCDA. Our role as interpreters is made no less difficult, and correspondingly no less subject to criticism, when Congress employs ambiguous operative language in setting forth the criteria for obtaining the benefit of its programs. Our problem here is determining what Congress meant when it stated that "the projected use of funds [must be] developed so as to give maximum feasible priority to activities which will benefit low- and moderate-income families ...." 42 U.S.C. § 5304(b)(3) (1983). When

---

9. Statement of John J. Knapp, General Counsel, United States Department of Housing and Urban Development, Dec. 7, 1982, Hearing Before the Subcommittee on Housing and Community Development at 35.

Congress enacted the HCDA in 1974, it considered and refused to adopt a Senate version that would have further defined "maximum feasible priority" by imposing a rigid percentage limiting the amount of funds available for activities that do not benefit low or moderate income individuals. 721 F.2d at 775. We remain convinced that when it declined to enact a strict principal benefit provision, Congress intended to allow HUD to exercise its discretion in determining which projects were best suited for funding. Over the years, HUD has found it difficult but has used its best efforts to further the purposes of the Act and to predict the will of the majority of Congress.[10] After a few years of experience, and prompted by HUD's 1982 proposed regulations, Congress decided to remove some of the agency's discretion and has now enacted more strict principal benefit requirements, but that does not affect our holding that there was no principal benefit requirement in the statute when HUD waived its regulation. If anything, it supports our reasoning that had Congress intended a rigid fifty-one percent test, it would have, as it now has, enacted one.

The petition for rehearing by the panel is DENIED.

JOHNSON, Circuit Judge, dissenting:

After careful review of the legislative history of the CDBG program from 1974–1983 and the implementing regulations, I remain convinced that the principal benefit objective of the statute is a statutory requirement which cannot be waived by HUD. The 1983 amendments to the CDBG program and their legislative history strongly support, if not mandate, such an interpretation and further stand as the governing law to be applied in this appeal. I therefore, for the following reasons, dissent from the denial of the petition for panel rehearing.

### (1) The Legislative History of the 1983 Amendments to the CDBG Program

In order to place the 1983 amendments in their historical perspective, a brief chronology of the CDBG statute, its legislative history and implementing regulations follows.

In enacting the Housing and Community Development Act of 1974, Congress defined its purpose: "The primary objective of this chapter is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." 42 U.S.C.A. § 5301(c). In setting the criterion relevant in this case for approval of a grant Congress established the requirement that the grantee certify that its Community Development Program "has been developed so as to give maximum feasible priority to activities which will benefit low- or moderate-income families ..." 42 U.S.C.A. § 5304(b)(2) (1974). Nothing on the face of the statute prevents a consistent interpretation of these two provisions, with "maximum feasible priority" read in light of the stated Congressional objective of principally benefiting persons of low and moderate income.

The legislative history of the 1974 Act does not preclude such an interpretation. The original Senate version of 42 U.S.C.A. § 5304(b)(2) contained a provision prohibiting more than twenty percent of an applicant's community development funds to be used for activities which did not directly benefit low and moderate income families. This requirement was deleted from the bill by the Conference Committee before final passage and the term "maximum feasible priority" substituted without explanation. Congress' silence for its reasons in rejecting the eighty percent requirement does not indicate, however, that it was repudiating its stated objective of principally benefiting low and moderate income families. Instead, this deletion logically indicates

---

**10.** Statement of Stephen J. Bollinger, Assistant Secretary for Community Planning and Development, United States Department of Housing and Urban Development, Dec. 7, 1982, Hearing Before the Subcommittee on Housing and Community Development at 94.

that Congress was concerned with providing more flexibility with funds in achieving its objective of principally benefiting low and moderate income families.

Any doubts as to whether the principal benefit objective of Congress is a statutory requirement embodied in § 5304(b)(2) of the Act as well as § 5301(c) were clearly resolved by the 1977 amendments to the statute. The House Conference Report states:

*Application disapproval*

The Senate amendment contained a provision not included in the House bill which provided for the disapproval of block grant applications which do not comply with the requirements of the block grant program and specifically with the primary purpose that the program principally benefit persons of low- and moderate-income. The conference report contains the Senate provision amended *to specifically incorporate the present law requirements that no application be approved unless it:* (1) aids in the prevention or elimination of slums and blight, (2) *principally benefits persons of low- and moderate-income*, or (3) meets a need of particular urgency. (emphasis supplied).

Conf.Rep. No. 95–634, *reprinted in* 1977 U.S.Code Cong. & Ad.News at 2965. As the panel majority notes, "this language reflects that particular Congress' understanding that maximum feasible priority means above and beyond primarily benefiting low and moderate income persons." 721 F.2d at 776. Further, this language reflects Congress' understanding that the principal benefit "present law requirement" was statutorily embodied in § 5304(b) (2) as well as § 5301(c). Finally, although "the view of a later Congress does not establish definitively the meaning of an earlier enactment ... it does have persuasive value," *Bell v. New Jersey*, 461 U.S. 773, 784, 103 S.Ct. 2187, 2194, 76 L.Ed.2d 312, 323 (1983); especially when, as here:

[W]e have Congress at its most authoritative, adding complex and sophisticated amendments to an already complex and

sophisticated act. *Congress is not merely expressing an opinion ... but is acting on what it understands its own prior acts to mean.*

*Id.* at 785 n. 12, 103 S.Ct. at 2194 n. 12, 76 L.Ed.2d at 323 n. 12 (citation omitted) (emphasis added).

Although entitled to deference if consistent with the Congressional objective of the statute, HUD's interpretations of the statute have been both inconsistent internally and inconsistent with the primary objective of the statute. The original 1974 implementing regulations did not contain a principal benefit requirement for § 5304(b)(2). In 1977 HUD proposed, and in 1978 promulgated, a regulation requiring that at least fifty percent of the persons benefited by the activities be of low or moderate income. 24 C.F.R. § 570.302(d)(2). As the panel majority notes, the fact that in proposing this regulation HUD appeared unsure whether "the principal benefit requirement was even [statutorily] permissible," 721 F.2d at 778, does not require an interpretation of the statute at variance with "the statutory mandate or that [would] frustrate the policy that Congress sought to implement." *Id.*, quoting *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981).

In 1981 Congress again amended the Act, "restructuring its provisions to emphasize administrative oversight of post-award use of funds instead of stringent enforcement of detailed application requirements." 721 F.2d at 778. In this context, Congress expressed its disapproval of HUD's interpretation of the Act:

In the period since 1974, various pressures from both Congress and within HUD, have worked both to narrow the focus of the program and to layer thicker and more restrictive regulations on the application .... The HUD regional and area office staff has used the application process far too frequently as a means for imposing HUD's views of acceptable program activity on local entities.

S.Rep. No. 139, 97th Cong., 1st Sess. 227, *reprinted in* 1981 U.S.Code Cong. & Ad. News 396, 523. Although relevant to this case, the 1981 amendments to the Act did not affect the "maximum feasible priority" project requirement of former § 5304(b)(2) (now renumbered § 5304(b)(3)) and the legislative history contains no reference to 24 C.F.R. §§ 570.302(b)(1), (d)(2) and in fact reiterates the primary objective of the Act.[1] HUD has subsequently apparently considered the fifty percent benefit requirement of 24 C.F.R. § 570.302(b)(1) to be one of the "restrictive regulations" disapproved by Congress in the context of its 1981 restructuring of the CDBG program. Thus, on October 4, 1982, HUD published proposed amendments to 24 C.F.R. § 570. In relation to overall program benefit, the proposed amendments deleted the fifty percent benefit requirement of 24 C.F.R. § 570.302(b)(1) and stated that "in restructuring the approach used to determine compliance with the primary objectives, HUD will no longer conduct any review of the grantee's overall program with respect to benefit to low and moderate income persons." 47 Fed.Reg. 43912, 43932 (Oct. 4, 1982). In relation to particular activities within a given program, at issue in this case, the proposed amendments retained the principal benefit requirement of the previous rules. *Id.*

In reaction, Congress amended the CDBG program effective November 30, 1983, one month before the panel opinion in this case. The primary objective section of the Act was reworded:

The primary objective of this title and of the community development program of each grantee under this chapter is the development of viable urban communities, by providing [enumerated benefits]

principally for persons of low and moderate income. Consistent with this primary objective, not less than 51 percent of the aggregate of [CDGB funding] shall be used for the support of activities that benefit persons of low and moderate income...

42 U.S.C.A. § 5301(c). Amended § 5304(b)(3), the "maximum feasible priority" requirement, now reads:

[T]he aggregate use of funds received under [CDBG programs] shall principally benefit persons of low and moderate income in a manner that ensures that not less than 51 percent of such funds are used for activities that benefit such persons ...

The legislative history of the 1983 amendments is clear that in amending the statute Congress considered itself to be *clarifying* the initial principal benefit statutory objective and requirement set forth in the 1974 Act:

Relatively few changes are made to the programs[:] however[,] requirements for targetting the community development program principally for the benefit of [low] and moderate income families have been *clarified.*

S.Rep. No. 98–142, 98th Cong., 1st Sess. 2, *reprinted in* 1983 U.S.Code Cong. & Ad. News 1770, 1773 (emphasis added).

A major element of H.R. 1 is the attempt to *clarify* Congressional intent .... The Department of Housing and Urban Development and the Department of Agriculture have exercised options regarding program administration without respecting Congressional intent.... In particular, the Committee's efforts are specifically aimed at strengthening the Community Development Block Grant Program

---

1. The Committee believes that, in conjunction with the simplification and restructuring of the block grant program, it is desirable to reaffirm the program's overall objective contained in section 101(c)—the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income. As in existing law, this objective is to

be achieved through activities which carry out the three broad national objectives governing block grant expenditures and referred to in proposed section 104(b)(3): activities which benefit low- and moderate-income families; aid in the prevention or elimination of slums or blight; or meet other particular urgent community development needs.
*Id.*

so that low and moderate income people are the principal beneficiaries and to ensure that activities are benefiting low and moderate income people . . .

H.Rep. No. 98–123, 98th Cong., 1st Sess. 2 (emphasis added).

Provisions *clarify* the conditions under which credit for benefiting low and moderate income persons may be claimed by CDBG recipients.

*Id.* at 4 (emphasis added).

The bill also *clarifies* the extent to which certain activities may be considered to benefit low and moderate income families.

*Id.* at 10. (emphasis added). In sum, Congress was emphatically clear that it did not consider itself to be adopting a new principal benefit requirement but instead to be restating the principal benefit primary objective of the Act present since 1974 and recognized on both occasions that Congress had addressed the issue, 1977 and 1981.

Further, the 1983 legislative history expressly disapproves of HUD's interpretations of the Act's primary objective in the 1974 and proposed 1982 regulations and endorses the 1978 regulations' principal benefit test. I quote this portion of the House Report at length as evidence of Congress' interpretation of the history of the 1974 Act and its implementing regulations.

*Low and moderate income beneficiaries*

As a result of the amendments to the Community Development Block Grant Program which were adopted when the far-reaching Gramm-Latta amendments to the Omnibus Reconciliation Act of 1981 were approved, the Department of Housing and Urban Development undertook a comprehensive revision of the regulations governing the CDBG Program. However, instead of limiting the regulatory changes to those mandated by the 1981 Act, HUD proposed modifications that had the potential for a fundamental redirection of the program away from its primary objective, which is to develop "viable urban communities by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income."

Since the agency was singularly unresponsive to the concerns of the majority of the members of this Committee, to the issues raised during comprehensive hearings on these matters in 1981 and again in December 1982, and to the voluminous comments received by the agency which were highly critical of these changes, the Committee has decided that the statute must be modified so that the principles that have guided the program and which have been embodied in statute, regulations, as well as Departmental policy over the years will not be weakened by regulations that fail to assure that the primary objective of the program will be met.

When the CDGB Program was initially proposed by the Nixon Administration, the program provided so much flexibility to local governments that it more closely resembled a general revenue sharing program. In rejecting this approach, Congress determined that in order to receive federal CDBG funds, communities must assess their housing and community needs, must design a strategy to meet those needs and must develop a program individually tailored for the community which would meet the primary objective of the Act of providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income.

Ironically, during the first few years of the program, the program was governed by regulations that were not strong enough to reflect the intent of Congress. They were similar to those proposed by the present Administration, in that they merely restated the statutory language and resulted in many communities failing to principally benefit their low and moderate income residents. While HUD revised the regulations in 1978 to require that an applicant's program as a whole shall principally benefit low and moderate income persons and to

presume that this standard was met if at least 75 percent of its funds were allocated to activities principally benefiting low and moderate income persons, an attempt was made in that year to amend the statute to state that benefiting low and moderate income persons, eliminating slums and blight or meeting urgent needs were primary and coequal purposes of the Act. That amendment was rejected and the conferees reaffirmed the original intent of the program which provides for local assessment of local needs and the development of local solutions while making clear that its primary purpose is to develop viable urban communities principally for the benefit of low and moderate income persons. The regulations promulgated in 1978 are the ones the Administration is now proposing to weaken. Based on the extensive correspondence received by the Committee and the hearings held in 1981 and 1982, community after community has endorsed the necessity to retain regulations that provide unequivocal guidance regarding the use of CDBG funds for the benefit of low and moderate income families.

The Committee believes it is important that HUD promulgate strong and clear regulations requiring each recipient community to expend a majority of its CDBG funds for *activities* that actually benefit low and moderate income persons. The maintenance of this basic principle is particularly necessary when communities are hard hit by the recession and when the budgets of a wide variety of federal and state assistance programs are shrinking or stagnating. When less money is available to meet the needs of our citizens, the funds that are available should be targeted to those low and moderate income families most in need.

In order the [sic] assure the continued targeting of funds to low and moderate income families, the bill requires each entitlement community and small city to use at least 51 percent of its CDBG funds and loan guarantee authority to benefit low and moderate income families.

*Id.* at 8–10. From the legislative history of the 1983 amendments, I think it is clear that the panel majority's reliance on the 1974 regulations and the proposed 1982 regulations is misplaced. Further, I think it is equally clear that since 1974 Congress has followed a consistent interpretation of the Act as containing not only a statutory objective but a statutory requirement in § 5304 that a program as a whole, as well as activities within a given program, principally benefit persons of low and moderate income. This statutory requirement cannot be waived by HUD. Therefore, the petition for rehearing is, in my judgment, due to be granted on this ground.

(2) *The Applicability of the 1983 Amendments to this Appeal*

The 1983 amendments became effective one month before the panel opinion in this case. *Bradley v. Richmond County School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), is controlling on the issue of whether the 1983 amendments should govern the disposition of this appeal. In *Bradley,* the Court held "that a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Id.* at 711, 94 S.Ct. at 2016. In the 1983 amendments and its legislative history there is no express statement that the amendments should be applied either retroactively or prospectively. In fact, the legislative history of the 1983 amendments concerning the principal benefit requirement indicates that Congress has always assumed that this requirement must be met before funds can be allocated to a grantee. In *Bradley,* the Court stated that "[w]e must reject the contention that a change in the law is to be given effect in a pending case only where that is the clear and stated intention of the legislature." *Id.* at 715, 94 S.Ct. at 2018. Therefore, the fact that the 1983 amendments do not provide a clear statutory direction on the law to be applied to this appeal does not mean

that only a prospective application is mandated.

Further, the manifest injustice exception recognized by *Bradley* is a narrow one, and is, in my judgment, not applicable to this case. The *Bradley* Court noted that "although the precise category of cases to which this exception applies has not been clearly delineated," *id.* at 717, 94 S.Ct. at 2019, the focus of such an inquiry centers upon "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact in the change in law upon those rights." *Id.* The *Bradley* Court noted that it had recognized that manifest injustice could result "in mere private cases between individuals," *id.* at 717, 94 S.Ct. at 2019, *quoting United States v. Schooner Peggy,* 1 Cranch 103, 110, 2 L.Ed. 49 (1801), and held that an award of attorneys' fees in a school desegregation case did not involve a "routine private lawsuit" and that application of a newly enacted attorneys' fees statute was required in light of the principle that in "great national concerns ... the court must decide according to existing laws." *Id.* at 719, 94 S.Ct. at 2020, *quoting Schooner Peggy,* 1 Cranch at 110. Certainly the present case does not involve routine private litigation and does involve an area of great national concern with far-reaching implications for the CDBG program. Thus, I conclude that the first prong of the *Bradley* manifest injustice inquiry is not passed in this case.

Second, the *Bradley* Court found that application of the intervening attorneys' fees statute did not affect any matured or unconditional rights of the defendant. "It cannot be claimed that the publicly elected School Board had such a right in the funds allocated to it by the taxpayers." *Id.* at 720, 94 S.Ct. at 2020. In this case, neither the City of Alma nor HUD had an absolute right to the CDBG funds. Third and finally, the impact of the 1983 amendments on the conditions necessary to receive a CDBG grant is minimal since the 1978 regulations requiring a principal benefit showing were in effect at the time of the grant. In sum, in my judgment the 1983 amendments are

the governing law to be applied in this appeal under *Bradley* and none of the *Bradley* exceptions are applicable to this case. Therefore, I would grant the petition for panel rehearing on this ground.

In conclusion, the 1983 amendments confirm the evidence of Congressional intent since 1974 that the principal benefit requirement is a statutory requirement that cannot be waived by HUD and are the governing law to be applied in this appeal. Therefore, I would grant the petition for panel rehearing and modify the opinion in light of the 1983 amendments.