ASSOCIATION OF ACCREDITED COSMETOLOGY SCHOOLS, Plaintiff,

v.

Lamar ALEXANDER, Defendant.

DELTA JUNIOR COLLEGE, INC., et al., Plaintiffs,

v.

Lamar ALEXANDER, Defendant.

Civ. A. Nos. 91–2220 (HHG), 91–2338 (HHG).

United States District Court, District of Columbia.

Oct. 1, 1991.

Leonard C. Greenebaum, Thomas Hylden, Robert D. Lystad, Baker & Hostetler, Washington, D.C., for Association of Accredited Cosmetology Schools.

Douglas A. Wickham, Asst. U.S. Atty., Washington, D.C., for Lamar Alexander in Civ.A. No. 91–2220.

Brian P. Siegel, Ronald B. Sann, Office of Gen. Counsel, U.S. Dept. of Educ., of counsel.

Richard A. Fulton, Stanley A. Freeman, Peter S. Leyton, White, Fine & Verville, Washington, D.C., for Delta Junior College, Inc., et al.

Robert L. Shapiro, Asst. U.S. Atty., Washington, D.C., for Lamar Alexander in Civ.A. No. 91–2338.

## OPINION

HAROLD H. GREENE, District Judge.

The Association of Accredited Cosmetology Schools (Association) seeks to enjoin the Secretary of Education from enforcing certain regulations affecting the schools' eligibility to participate in federal student aid programs, on the grounds that the regulations violate the controlling statute, are unconstitutional, and were promulgated in violation of the Administrative Procedure

Act (APA). Delta Junior College (Delta College) and eight other schools in a separate action seek an injunction on similar grounds. The Department of Education (Department) has moved to dismiss all plaintiffs' motions, or in the alternative, for summary judgment, and a hearing was held on all the motions. Upon consideration of the papers and the hearing, the Court finds for the defendant on the merits and accordingly denies the plaintiffs' motions for a preliminary injunction and grants the defendant's motion for summary judgment.

## I

### Factual Background

Title IV of the Higher Education Act authorizes a number of grant and loan programs for students attending postsecondary schools. However, a student may obtain Title IV financial aid [1] only if he or she is attending a school determined by the Department to be eligible to participate in the Title IV programs. Regulations promulgated in 1989 conditioned a school's eligibility on its "cohort default rate," which is based on the rate at which that school's students default on their federal student loan obligations.

As part of the Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, Congress tightened the school eligibility conditions by enactment of the "Student Loan Default Prevention Act of 1990." Prior to the enactment of this statute, the Senate Permanent Subcommittee on Investigations conducted a series of hearings which indicated, *inter alia*, that a number of proprietary school operators were unscrupulous, victimizing both the students and the loan program. High loan default rates were found to be a common threat of abuse in the problem schools; indeed, according to the Subcommittee, about half of the 2,200 proprietary schools had default rates of over twenty percent. Report of Permanent Subcommittee on Investigations

of the Senate Committee on Governmental Affairs, S.Rept. 102–58 (May 17, 1991) at 2–11. Significantly, student loan defaults increased by 338 percent between 1983 and 1989, and the cost of defaults as a percentage of total Guaranteed Student Loan (GSL) programs rose from about ten percent in 1980 to over fifty percent in 1990. *Id.* at 1.

It was to deal with these problems in the context of a general effort to reduce the government deficit that an amendment to section 435(a) of the Higher Education Act (codified at 20 U.S.C. § 1085(a)) was enacted. That amendment rendered schools ineligible for participation in the student aid programs if their cohort default rates exceeded levels of thirty-five percent and thirty percent for certain years. On May 13, 1991, the Secretary of Education published a Notice of Proposed Rulemaking (NPRM) in the Federal Register, 56 Fed.Reg. 22056, to implement this statutory provision. Following the receipt of comments, the final regulations were published on July 19, 1991, at 56 Fed.Reg. 33332, and they became effective on September 2, 1991.

On August 30, 1991, notices were sent to a number of schools, including many of the schools affiliated with plaintiffs, advising them that their default rates were excessive, and that, unless this determination was reversed on appeal, they would be terminated from the student aid program. The schools have a right to appeal on very limited grounds, and the completed appeals are due on October 2, 1991. A participating institution may continue to participate in the program pending determination of its appeal, but if the appeal rests on grounds not provided for in the regulations—which is not unlikely in view of the restrictive appeal rights—its termination from the program will be effective on October 2, 1991. It was in light of these deadlines that the plaintiffs sought injunctive relief when they filed their complaints in this Court on August 30, 1991, and Septem-

---

**1.** Typically, a student receives a loan from a bank or other lender to pay tuition, fees, and living expenses, repayment is insured by a State or private non-profit guarantee agency, and the federal Department of Education provides reinsurance. The Department may also pay the interest on the loan.

ber 16, 1991, respectively. Briefing was ordered to proceed on an expedited basis, and the Court heard oral argument on September 19, 1991. This Opinion disposes of all aspects of the controversy.

## II

### *Meaning of the Statute*

■ The parties differ profoundly on the meaning of section 435(a) under which the regulations at issue were promulgated. The key portion of the statute reads:

(A) An institution whose cohort default rate is equal to or greater than the threshold percentage specified in subparagraph (B) for each of the three most recent fiscal years for which data are available shall not be eligible to participate in a program under this part for the fiscal year for which the determination is made and for the two succeeding fiscal years. . . .

(B) For purposes of determinations under subparagraph (A), the threshold percentage is—

(i) 35 percent for fiscal year 1991 and 1992; and

(ii) 30 percent for any succeeding fiscal year.

The plaintiffs[2] argue that the threshold percentages refer to the year in which the defaults occur, while the Department contends that these percentages apply to the year in which the determinations of ineligibility are made.

In support of their position, plaintiffs rely on the fact that a specific default rate is specified in section 435(a) only for 1991 and 1992, and that, as for other years, the section directs that a school's eligibility will be cut off if its default rate is greater than the specified percentages "for each of the three most recent fiscal years." In that view, since the statute is silent as to the appropriate default rate for the years prior to 1991, the Department must look to existing law to determine the thresholds for those three years, that is, to 34 C.F.R. § 668.15(b) (July 1, 1990), which specifies default rates of between forty and sixty percent depending upon the year and the circumstances. The schools are apparently not in violation of these earlier rates, and, according to plaintiffs, their eligibility may therefore not be cut off at this time.

The Department argues in response that subparagraph (B) of section 435(a)(3), which sets forth the threshold percentages for the various years, ties them to determinations under subparagraph (A) which refers to the "fiscal year for which the determination is made" and the two succeeding fiscal years. Under that reasoning, the statute must be construed to provide that the year in which the determination is made is the key to the applicable percentages. Thus, as the Department sees it, it is its obligation, first, to determine the threshold percentage under the statute, *e.g.,* thirty-five percent for 1991; and second, to compare any particular school's default data for the preceding three fiscal years with that percentage. If the percentage for those years preceding 1991 exceeds thirty-five percent, for example, the school becomes ineligible.[3]

Most basically, then, as indicated, the parties differ on the question whether the threshold percentages in the statute refer to the year in which the defaults occur (as the plaintiffs contend) or to the year in which the determinations of eligibility are made (as the Department argues).

The statute is not without ambiguity. There is also some force to plaintiffs' contention that, if Congress had intended the schools' eligibility to be conditioned upon cohort default rates not exceeding thirty-five percent for fiscal years 1987 through 1990 (notwithstanding that the schools and their students complied with the then existing default rates during those years) it would have said so. As the plaintiffs see it, the more plausible interpretation—and

---

**2.** Some of the arguments are advanced by Association of Accredited Cosmetology Schools, plaintiff in Civil Action No. 91–2220, some by Delta Junior College, Inc., et al., plaintiffs in Civil Action No. 91–2338, some by both. The Court will generally refer to the points as having been made by "plaintiffs."

**3.** The same formula is applied in 1992, and similar computations are made in 1993 and any following year on the basis of a thirty percent threshold.

the one that avoids the problems of retroactivity and due process (*see infra*), and that also precludes the Department from dictating the rates as it sees fit by its choice of the year in which it makes its determinations—is to regard the reference to the years in subparagraph (B) as meaning those in which the defaults occur rather than those in which the determinations are made.

That interpretation is not inconceivable as an initial proposition. But the Court is not faced with the issue in that posture, but with an ambiguous statute which has been interpreted by the agency having enforcement jurisdiction in a manner that is consistent with the statute's language. Accordingly, absent other considerations, the Court must defer to that interpretation. *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Moreover, and significantly, the Department's interpretation is most compatible with the underlying congressional purpose. As noted, the Student Loan Default Prevention Act was part of the Omnibus Budget Reconciliation Act of 1990 which had as its dominant purpose the achievement of immediate budgetary savings. In fact, a bill which did not decrease federal expenditures in fiscal year 1991 would have been subject to a point of order. 2 U.S.C. § 644. Only the loss of eligibility of high default schools in the 1991 fiscal year would have resulted in the savings that Congress expected and intended. *See also*, H.Rept. 101–881, 101st Cong.2d Sess. at 61 (1990). This congressional purpose strongly supports the Department's interpretation of the statute, for if the plaintiffs' construction is correct, eligibility losses and reductions in funding on account of defaults would not take effect for several years.[4]

## III

### *Retroactivity*

■ This conclusion regarding the meaning of the statute is not impaired by arguments concerning retroactivity. Plaintiffs argue that, as interpreted by the Department, the statute will have a retroactive effect because schools will be rendered ineligible now for default rates which occurred in the past. For example, in 1992, based on the Department's interpretation, a school's eligibility will be terminated if its default rates for the past three years (1989–91) exceed thirty-five percent. At the time those defaults occurred in 1989 and 1990, however, previous regulations provided that schools remained eligible unless their default rates exceeded sixty percent and fifty-five percent, respectively, for those two years or unless their default rates exceeded forty percent and had not been reduced by five percent from the previous year's rate. 34 C.F.R. § 668.15(b) (1990). Schools may become ineligible, therefore, for having incurred default rates which were permissible at the time, but which are impermissible now.

The plaintiffs are correct that the law disfavors interpretations that would give statutes a retroactive application. *See, e.g., Swinton v. Kelly*, 554 F.2d 1075, 1079 (D.C.Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976) ("A judicial preference for prospective as opposed to retrospective legislative endeavor is well entrenched"). However, the statute and the regulations here are not retroactive.

A statute is not impermissibly retroactive "merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment." *Reynolds v. United States*, 292 U.S. 443, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934); *see also*, 2 Sutherland Statutory Construction § 41.02, p. 341. As the Fifth Circuit held in a case involving reductions in current benefits of food stamp recipients on account of overpayments made prior to enactment of the statute:

---

4. This dominant congressional purpose is not negated by the circumstance that language in S. 3209, which most directly supports the Department's interpretation, was not incorporated in the law as ultimately enacted. Congress could have had many reasons for not adopting the earlier language, and its failure to do so does not constitute a sufficiently compelling reason for rejecting the Department's interpretation.

[w]e are persuaded that the state's application of [the law] to appellants is a prospective one. The state is reducing *current* benefits to offset *current* debts of food stamp recipients. The reduction in current benefits was made after, ... the effective date of implementing Louisiana regulations. Such an application ... to valid indebtedness whenever incurred is a prospective application of the statute.

*Alexander v. Robinson,* 756 F.2d 1153, 1155 (5th Cir.1985) (emphasis in original). Moreover, there is no fatal unfairness in the rule as applied in the present situation, for unduly high default rates are a phenomenon that need not be tolerated, for which the schools had some responsibility (*see generally* Report of Permanent Subcommittee on Investigations, S.Rept. 102–58), and that the plaintiff schools should have addressed on their own before now.

Plaintiffs rely in support of their retroactivity argument primarily upon *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). However, in that case, the government by regulation sought to recoup past payments to health service providers, and the Supreme Court held that regulation to be retroactive in character on that basis. In the instant situation, no recoupment is sought; the Department pursuant to the statute will simply decline prospectively to provide further student financial aid on account of past experience with the students and the schools. The argument based on retroactivity is accordingly rejected.

## IV

### *Due Process*

Plaintiffs next contend that the regulations violate their due process rights under the Fifth Amendment.

Assuming, without deciding, that plaintiffs have a protected property or liberty interest in continued participation in the student aid programs, procedural due process is provided when eligibility is terminated, and there is no substantive due process violation.

■ A school with impermissibly high default rates receives a notice of termination. It may appeal within the statutory time frame of thirty days of receiving the notice, and the Department must decide the appeal within forty-five days thereafter. 20 U.S.C. § 1085(a)(3). The bases for an appeal are provided in the statute.[5] Although the appeal is resolved on written materials submitted without an oral hearing, this is sufficient predeprivational due process, given the constraints of the statutory time limits. *See Continental Training Services, Inc. v. Cavazos,* 893 F.2d 877, 893–94 (7th Cir.1990).

■ Plaintiffs also argue that the statute, if given the Department's interpretation, is so irrational as to violate substantive due process. The legislative goal of reducing student defaults on federal loans is obviously permissible. The means chosen to do this—excluding those schools whose students have a high, consistent pattern of defaulting—are not irrational. This is so particularly since Congress had before it evidence that (1) there was a correlation between student default rates and a school's inability to administer the loan programs, and (2) schools with high default rates were harming low income students by inviting them to join but then took no action to ensure that the students graduated or found jobs. It may not be particularly fair for Congress to terminate schools' eligibility based on past defaults which the schools can do nothing about now, but it is not unconstitutional.[6]

## V

### *Administrative Procedure Act*

■ Plaintiffs finally claim the Department violated the Administrative Procedure

---

5. 20 U.S.C. § 1085(a)(3)(i), (ii), provides for appeals on the basis of an inaccurate calculation of the cohort default rate or if there exists "in the judgment of the Secretary, exceptional mitigating circumstances that would make the application of this paragraph inequitable." Those mitigating circumstances have been elaborated upon by the Secretary in the final regulations.

6. Plaintiffs also allege that the statute and regulations unconstitutionally impair existing con-

Act by failing to provide notice and an opportunity to be heard on a provision in the final regulations which listed the specific exceptional mitigating circumstances under which an agency may appeal a notice of termination.

The May 13, 1991 notice specifically stated the criteria the Department was considering adopting as mitigating circumstances:

(1) The socioeconomic status of the students served by the institution, (2) the progress of the institution in reducing the dollar value of defaulted loans, (3) the economic health and general state of employment in the region, (4) the historic mission of the school, and (5) the successful completion and job placement of students. 56 Fed.Reg. 22058 (May 13, 1991).

The final regulations adopt mitigating circumstances based on a school's reduction of its cohort default rate and the socioeconomic status, job placement, and completion rate of its students. To be sure, the final regulations do not exactly track the proposed regulations, but they are not required to do so: if they were, an "agency [could] learn from the comments on its proposals only at the peril of starting a new procedural round of commentary." *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 n. 51 (D.C.Cir.1973). Final regulations need only be a "logical outgrowth" of a proposed regulation, *Natural Resources Defense Council, Inc. v. Thomas*, 838 F.2d 1224, 1242 (D.C.Cir.), *cert. denied*, 488 U.S. 888, 109 S.Ct. 219, 102 L.Ed.2d 210 (1988), and the Department's narrowing of what constitutes exceptional mitigating circumstances meets this standard.[7]

Delta College complains about two other provisions in the final regulations for which notice and opportunity to comment were allegedly inadequate. Thus, that plaintiff asserts that the final regulations contain a "complex" new formula for measuring student completion rates, 56 Fed.Reg. 33348, but it fails to point out in what way this constitutes a significant substantive change. The Administrative Procedure Act "does not require that interested parties be provided precise notice of each aspect of the regulations eventually adopted. Rather, notice is sufficient if it affords interested parties a reasonable opportunity to participate in the rulemaking process." *Forester v. Consumer Product Safety Comm'n*, 559 F.2d 774, 787 (D.C.Cir.1977).

The other Delta College complaint relates to a new requirement in the final regulations, 56 Fed.Reg. 33348, that prior to requesting that a guarantee agency verify any default rate data that a school believes to be faulty, a school must specifically identify those student borrowers for whom discrepancies exist by name and social security number. The May 13, 1991 notice did, however, specify that appeals based on inaccurate default data would require data verification from the guarantee agencies, 56 Fed.Reg. 22058, and the provision in the final regulations is a "logical outgrowth" of that provision.

More generally, Delta College asserts the regulations are arbitrary and capricious because the termination of schools' eligibility under the regulations will depend on cohort default rates that are faulty and inaccurate. However, the data upon which the Department relies, while not perfect, are as accurate as they can be under the circumstances. The Department is provid-

---

tracts. Even assuming that participation in the student aid programs is tantamount to a contract with the government, the Association of Accredited Cosmetology Schools concedes that it would be permissible for Congress to enact prospective changes to that "contract," but argues it would be impermissible for Congress to enact retroactive changes. *See* Memorandum of Points and Authorities in Support of Plaintiff's Motion at 37. As discussed above, however, the statutory and regulatory changes are prospective, not retroactive.

7. Delta College objects to the precise method for measuring student job placement rates which the Department included in the final regulations. That formula relates to how the Department evaluates a school's claimed mitigating circumstance, and as such the formula is a permissible "logical outgrowth" of the Department's proposal on exceptional mitigating circumstances.

ed taped information on some thirty-five million loans, it conducts systematic edits of the data, and when notifying a school with respect to defaults it provides the school with detailed information concerning the individual borrowers.

Delta College also argues that the Department failed to provide objective criteria justifying the new regulatory provision which states that one exceptional mitigating circumstance is where an:

> institution has reduced its cohort default rate for each of the two most recent fiscal years for which the Secretary has calculated a cohort default rate for that institution by 50 percent of the amount by which its cohort default rate for the previous year exceeds the applicable threshold percentage.

56 Fed.Reg. 33333.

Delta College concedes the Department provided notice of this proposal in the May 13, 1991 NPRM. Plaintiff's Motion for Preliminary Injunction at 24. Furthermore, the Department provided an explanation of the policy behind this provision, 56 Fed.Reg. 22058, namely that it would be inequitable to terminate those schools which have made significant strides in reducing their default rates. There seems no compelling reason why the Department should also have been required to provide technical data in support of this particular version.

## VI

### *Conclusion*

For the reasons stated, the Department's motions for summary judgment are being granted.