ASSOCIATION OF ACCREDITED
COSMETOLOGY SCHOOLS,
Appellant,

v.

Lamar ALEXANDER, Secretary, United
States Department of Education.

No. 91–5332.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 23, 1992.

Decided Nov. 24, 1992.

Thomas Hylden, with whom Leonard C. Greenebaum and Robert D. Lystad, Washington, D.C., were on the brief, for appellant.

Douglas A. Wickham, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before: WALD, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

In this case, the Association of Accredited Cosmetology Schools ("AACS") challenges the constitutionality of the Student Loan Default Prevention Initiative Act, 20 U.S.C. § 1085(a) (1988 Supp. II), and the implementing regulations, 56 Fed.Reg. 33,-332, 33,338 (1991) (to be codified at 34 C.F.R. § 668.15(f)–(i) (1992)). AACS also challenges the regulations under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq. (1988). The District Court upheld the Act and the regulations, *Association of Accredited Cosmetology Schools v. Alexander,* 774 F.Supp. 655

(D.D.C.1991), and AACS now appeals. Finding no error in the District Court's decision, we affirm.

## I.

Under Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1070 *et seq.* (1988), students may obtain "Guaranteed Student Loans" ("GSLs") to pay their post-secondary tuition and expenses. Schools wishing to participate in the GSL program must apply to the Department of Education ("Department") for certification as "eligible institutions" under the HEA. As one might expect, such certification depends on the schools' satisfaction of several statutory and regulatory requirements. If a school's application is approved, the school must sign a contract with the Department called a "Program Participation Agreement." In signing the Agreement, the school agrees, *inter alia,* "to comply with all the relevant program statutes and regulations governing the operation of each Title IV, HEA Program in which it participates." *Program Participation Agreement,* at 2. The school also agrees that the Agreement "automatically terminates ... [o]n the date the institution no longer qualifies as an eligible institution." *Id.* at 6. Once both parties have signed the Program Participation Agreement, participating lenders are authorized to make GSLs to the school's students. 20 U.S.C. § 1071; 34 C.F.R. § 682.100 (1990). State or non-profit agencies guarantee the repayment of the GSLs. 20 U.S.C. § 1078(b)–(c). The Department, in turn, "reinsures" the guarantee agencies, 20 U.S.C. § 1078(c); 34 C.F.R. § 682.404, meaning that it will pay off a defaulted loan with federal funds after specified collection efforts have proven futile. 34 C.F.R. §§ 682.410(b)–.411 (1990).

Unfortunately, the Department found itself having to pay off an ever-increasing number of defaulted loans. Between 1983 and 1989, the number of GSL defaults increased by 338%—four times the growth in GSL loan volume during the same period. *See Abuses in Federal Student Aid Programs,* S.Rep. No. 58, 102d Cong., 1st Sess.

1 (1991) (hereinafter, *"Senate Report"*). These defaults, which had cost the federal government more than $2 billion by fiscal year 1989, U.S. DEP'T OF EDUC., FY 1989 GUARANTEED STUDENT LOAN PROGRAMS DATA BOOK 72, were disproportionately attributable to "proprietary" (for-profit) trade schools, whose students had a 50.6% default rate—almost twice the national average. *Id.* at 62. There was also well-documented evidence of GSL fraud by some proprietary schools; for example, certain schools realized enormous profits by increasing tuition without cost-justification, soon after qualifying for the GSL program. *See Senate Report* at 8–9.

Convinced that the Department's efforts to prod schools to reduce their students' default rates had been ineffective, Congress enacted (as part of the Omnibus Budget Reconciliation Act of 1990, Pub.L. No. 101–508, 104 Stat. 1388) the Student Loan Default Prevention Initiative Act ("Act"), 20 U.S.C. § 1085(a) (1988 Supp. II). The Act, which became effective on July 1, 1991, amended the HEA's definition of "eligible institutions" to provide, in relevant part, as follows:

(A) An institution whose cohort default rate is equal to or greater than the threshold percentage specified in subparagraph (B) for each of the three most recent fiscal years for which data are available shall not be eligible to participate in a program under this part for the fiscal year for which the determination is made and for the two succeeding fiscal years....

(B) For purposes of determinations under subparagraph (A), the threshold percentage is—

(i) 35 percent for fiscal year 1991 and 1992; and

(ii) 30 percent for any succeeding fiscal year.

20 U.S.C. § 1085(a)(3). The very next year, while this suit was pending before the District Court, Congress amended the Act to reduce the threshold for terminating schools with excessive cohort default rates ("CDRs"). *See* Higher Education Amendments of 1992, Pub.L. No. 102–325, 106

Stat. 448 (lowering the Act's 30% CDR threshold for FYs after 1993 to 25%), *amending* 20 U.S.C. § 1085(a).

In plain terms, the CDR approximates the rate at which students entering repayment in a given fiscal year default in that same year. In legalese, the CDR is defined as follows:

[F]or any fiscal year in which 30 or more current and former students at the institution enter repayment on loans under section 1078 or 1078–1 of this title received for attendance at the institution, the percentage of those current and former students who enter repayment on such loans received for attendance at that institution in that fiscal year who default before the end of the following fiscal year.... For any fiscal year in which less than 30 of the institution's current and former students enter repayment, the term "cohort default rate" means the average of the rate calculated under the preceding sentence for the 3 most recent fiscal years.

20 U.S.C. § 1085(m). From this definition, it follows that a school's CDR for a given fiscal year cannot be calculated until two years later. The CDR for a given fiscal year is calculated according to the number of students who default by the end of the next fiscal year. Schools then compile that information and submit it to the Department. Only then, two years later, is the Department in a position to calculate the CDR.

After the Act became effective, the Department promulgated implementing regulations. These regulations provide, so far as pertinent here, that

(1) Except as [otherwise] provided ..., an institution loses its eligibility to participate in the GSL programs if the Secretary determines that the institution's cohort default rate, for each of the three most recent fiscal years for which the Secretary has determined the institution's rate, is equal to or greater than the applicable threshold rates.

(2) For purposes of the determinations made under paragraph (f)(1) of this section, the threshold rates are—

(i) 35 percent for each of fiscal years 1991 and 1992; and

(ii) 30 percent for fiscal year 1993 and all subsequent fiscal years.

56 Fed.Reg. 33,332, 33,338–39 (1991) (to be codified at 34 C.F.R. § 668.15(f)(1)–(2)).

The regulations further provide that termination for excessive CDRs becomes effective eight days after official notice from the Secretary and persists for the remainder of the fiscal year in which the school was terminated and for "the two subsequent fiscal years." *Id.* at 33,339 (to be codified at 34 C.F.R. § 668.15(f)(3)(i)–(ii)). The sole exception is where a school has filed an administrative appeal, in which case the termination does not take effect until the Secretary has ruled on the appeal. *Id.* at 33,338 (to be codified at 34 C.F.R. § 668.15(f)(7)(2)). At the end of the two-year period of ineligibility, the school may regain its eligibility by reapplying for certification as an eligible institution. *Id.* (to be codified at 34 C.F.R. § 668.15(f)(4)(ii)).

Shortly before these regulations became final on September 2, 1991, the Department began investigating schools to determine whether their CDRs exceeded the new thresholds. This investigation revealed that numerous members of AACS had excessive CDRs. The Department promptly notified at least twenty-three of them that unless they showed that it had erred in concluding that their CDRs exceeded the new thresholds or that "exceptional mitigating circumstances" existed, they would be declared ineligible for the GSL program. If terminated, member schools stand to lose 25–47% of their revenues, which will force many to go out of business. AACS, on behalf of its 482–member proprietary schools of cosmetology, therefore filed this suit against Lamar Alexander, the Secretary of Education, challenging the legality of the Act and the regulations promulgated thereunder.

AACS argued before the District Court that the regulations are "arbitrary or capricious" within the meaning of the APA because they (1) retroactively upset, without clear authorization by Congress, member schools' vested right to continued GSL eligibility, and (2) make the applicable default rate depend entirely on the time the Secretary chooses to investigate a given school. AACS further argued that the Act and the regulations violate the Due Process Clause, both procedurally and substantively, and abrogate cosmetology schools' contractual rights under their Program Participation Agreements. Unpersuaded, the District Court granted the Secretary's motion for summary judgment, thereby upholding the Act and the Secretary's regulations. *Association of Accredited Cosmetology Schools v. Alexander,* 774 F.Supp. 655 (D.D.C.1991).

AACS renews each of these contentions before us, and we address them in turn below. It also argues that the Department's appellate procedures are arbitrary or capricious because they require schools facing termination to produce information known only to the Department in order to challenge the calculation of their GSL default rates. However, as the Secretary correctly observes, this argument was never raised below. Although we have the discretion to entertain new legal theories on appeal, "the usual rule is that such theories will not be heard except in exceptional cases." *District of Columbia v. Air Florida,* 750 F.2d 1077, 1078 (D.C.Cir. 1984). Because AACS has offered no reason for us to depart from that salutary rule, we decline to address its APA challenge to the appellate procedures provided in the Secretary's regulations.

## II.

### A. *The Validity of the Secretary's Interpretation of the Act*

■ AACS first argues that the Secretary's regulation conflicts with the Act. As passed in 1991, the Act's establishment of a 35% threshold CDR "for fiscal year 1991 and 1992," 20 U.S.C. § 1085(a)(3)(B)(i), and a 30% rate "for any succeeding fiscal year," 20 U.S.C. § 1085(a)(3)(B)(ii), means, according to AACS, that any school that had a fiscal year ("FY") 1991 or 1992 CDR below 35%, or a CDR below 30% for any subsequent fiscal year, cannot be terminated. Because the Act does not speak to

fiscal years before 1991 under its reading, the threshold CDRs for those years are those established by prior law. Under prior law, the thresholds for FYs 1989 and 1990 were either 40% or 60%, 34 C.F.R. § 668.15(b) (1989), and there were no thresholds for fiscal years before that. AACS claims the "plain meaning" of the text compels this reading of the Act. Consequently, the Secretary's interpretation, which allows the Department to apply the statutorily specified threshold rates to "each of the three most recent fiscal years for which the Secretary has determined the institution's rate," 34 C.F.R. § 668.15(f)(1), should be set aside.

We cannot agree. In our view the Secretary's reading is not only consistent with the words of the statute, it is the more plausible interpretation. Subsection (a)(3)(A) of the Act provides that for any fiscal year the maximum CDR is "the threshold percentage specified in subparagraph (B) *for each of the three most recent fiscal years for which data are available.*" 20 U.S.C. § 1085(a)(3)(A) (emphasis added). In our view, the italicized language of subsection (a)(3)(A), read in conjunction with subsection (a)(3)(B), supports the conclusion that Congress intended for the 35% threshold to apply to FYs 1987–89, the three most recent fiscal years for which data is available in 1991. Therefore, the Secretary's regulations accord with the apparent meaning of the Act.

We note our obligation to give "dispositive effect" to clear statutory language. *International Union, United Auto., Aerospace and Agric. Implement Workers of America v. General Dynamics Land Sys. Div.,* 815 F.2d 1570, 1575 (D.C.Cir.1987). As the Supreme Court has reminded us, "[i]f the statute is clear and unambiguous, 'that is the end of the matter, for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 685–86, 88 L.Ed.2d 691 (1986) (quoting *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)).

This is commonly referred to as "Step I" of the *Chevron* analysis.

The language of section 1085(a)(3) is so supportive of the Secretary's position that we might nearly stop here. However, insofar as there is any ambiguity, we are guided by the second step of the *Chevron* analysis, that is, where "Congress has not directly addressed the precise question at issue," we do not simply substitute our interpretation for that of the administrative agency. *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Rather, we recognize that " '[t]he power of an administrative agency to administer a congressionally created ... program, necessarily requires the formulation of policy, and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' " *Id.* (quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974)). Therefore, if we determine that the "choice [of the administrative agency] represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.* (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). Where the agency's reading is the most natural one, it is obviously reasonable, and the parties' competing forays into the legislative history do not convince us to the contrary. Consequently, we hold that the Secretary's interpretation of the Act is a permissible one.

**B.** *The Alleged Retroactivity of the Act and the Regulations*

■ AACS's central claim is that the Act and the implementing regulations are retroactive. They make past default rates grounds for termination from the GSL program, so the argument goes, even though those rates were permissible under prior law. *Compare* 56 Fed.Reg. 33,332, 33,338–39 (1991) (to be codified at 34 C.F.R. § 668.15(f)(1)–(2)) (setting 35% threshold for

CDRs in FYs 1991 and 1992, and 30% threshold for subsequent fiscal years) *with* 34 C.F.R. § 668.15(b) (1989) (setting no threshold for FYs 1987–88, 60% threshold for FY 1989, and 55% threshold for FY 1990). AACS contends that the facts of this case thus comport with those of several cases, particularly *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), and *National Wildlife Fed'n v. Marsh*, 747 F.2d 616 (11th Cir.1984), where courts have invalidated the application of new statutes or rules that change the legal significance of prior conduct.

The Secretary argues that neither the Act nor the regulation is retroactive. He contends that neither affects in the slightest member schools' past eligibility for GSL program participation. Rather, they merely require him, in determining member schools' future eligibility, to consider their past default rates. On this ground, the Secretary distinguishes this case from the two cases on which AACS principally relies, *Georgetown Univ. Hosp.* and *National Wildlife Fed'n.* In each of those cases, the Secretary claims, the regulations were properly characterized as retroactive because, unlike the laws here at issue, they sought to undo past eligibility by requiring the return or forfeiture of grants already awarded.

We agree with the Secretary that the Act and the regulations are not retroactive. A law is "retroactive" if it " 'takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past.' " *Neild v. District of Columbia*, 110 F.2d 246, 254 (D.C.Cir.1940) (quoting *Society for Propagating the Gospel v. Wheeler*, 22 F.Cas. 756, 767 (C.C.D.N.H.1814) (Story, J.)). Member schools have no "vested right" to future eligibility to participate in the GSL program. Although we do not doubt AACS's submission that the schools expected to be eligible in the future, such an expectation did not constitute vested interest. Nowhere in the Program Participation Agreements are member schools promised or

even led to believe that there will be no background changes in the federal law governing the GSL program. The Agreements explicitly provide that participating schools must "comply with all the relevant program statutes and regulations," *Program Participation Agreement*, Art. II, § 1, and that each Agreement (hence each school's eligibility) "automatically terminates ... [o]n the date the institution no longer qualifies as an eligible institution." *Id.* at Art. X, § 2(a). Therefore, AACS's member schools had no vested right to future eligibility for the GSL program.

That fact readily distinguishes this case from those on which AACS relies. In *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), the plaintiff hospitals had incurred millions of dollars in expenses under the Medicaid program since 1981, for which they had a right to be reimbursed by the federal government. *Id.* at 205, 109 S.Ct. at 469–70. In fact, the Department of Health and Human Services ("HHS") had actually reimbursed them for those expenses. *Id.* at 207, 109 S.Ct. at 470–71. However, in 1984 HHS issued a rule that provided a new method of calculating the reimbursements owed under the Medicaid program, a change in methodology that reduced the hospitals' 1981–84 reimbursements by more than $2 million, and then sought to recoup the overpayment. *Id.* It is plain that under any definition, the plaintiff hospitals had a vested right to the Medicaid payments they had received and that the 1984 rule retroactively impaired that right.

In *National Wildlife Fed'n v. Marsh*, 747 F.2d 616 (11th Cir.1984), the City of Alma, Georgia, planned to build an air/rail industrial park, updated water and sewage treatment facilities, a modern airport, and a recreational lake. After Congress enacted the Housing and Community Development Act of 1974 ("HACDA"), 42 U.S.C. § 5301 *et seq.* (1988), Alma applied for a grant thereunder to defray the cost of these projects. The Department of Housing and Urban Development awarded Alma a $2.3 million block grant for FYs 1975–77 and $399,600 for FYs 1978–79. *National Wild-*

*life Fed'n,* 747 F.2d at 618. The monies were not disbursed, however, due to litigation over the environmental effects of the planned development. *Id.* In 1983, Congress amended the HACDA to require that community development grants be used "principally [to] benefit persons of low and moderate income." 42 U.S.C. § 5304(b)(3) (1988). Because the Alma project did not meet that requirement, the 1983 amendment, if applied retroactively, would have required Alma to forfeit the prior grants. In these circumstances, the Eleventh Circuit was correct in saying that "Alma had a legitimate expectation that it would receive the grant." *National Wildlife Fed'n,* 747 F.2d at 621.

Instead of undoing past eligibility, as in *Georgetown Univ. Hosp.* and *National Wildlife Fed'n,* the Act and the regulations merely require the Department to look at schools' past default rates in determining future eligibility for GSL program participation. We regard this requirement as no different in substance than a lender's rule against extending credit to applicants with negative credit histories. Several cases have established that such a requirement does not operate retroactively. *See Reynolds v. United States,* 292 U.S. 443, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934) (holding that "[a] statute is not rendered retroactive merely because the facts or requisites upon which its subsequent action depends, or some of them, are drawn from a time antecedent to the enactment"); *Neild v. District of Columbia,* 110 F.2d 246, 255 (D.C.Cir.1940) (holding that a law is not retroactive simply because it depends on "'antecedent facts for its operation'") (quoting *Lewis v. Fidelity & Deposit Co.,* 292 U.S. 559, 571, 54 S.Ct. 848, 853, 78 L.Ed. 1425 (1934)).

AACS tries to distinguish *Reynolds* and *Neild* on the ground that in neither case did the entity adversely affected by the allegedly retroactive law have vested rights. AACS next argues, albeit without explication, that if *Reynolds* and *Neild* apply here, they should be rejected as inconsistent with the later decisions in *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), and *Ben-*

*nett v. New Jersey,* 470 U.S. 632, 641, 105 S.Ct. 1555, 1561, 84 L.Ed.2d 572 (1985). We reject both arguments.

First, AACS's attempted distinction is unavailing. We have held that AACS's member schools lack vested rights to continued eligibility for participation in the GSL program, so AACS's characterization of *Reynolds* and *Neild,* even if accurate, avails it nothing. Second, unlike AACS, we perceive no inconsistency between these later cases and *Reynolds* and *Neild.* In *Bowen,* it was undisputed that the HHS regulation changing the methodology for calculating Medicaid reimbursements was retroactive; the only issue was "whether the Secretary may exercise [his] rulemaking authority to promulgate cost limits that are retroactive." 488 U.S. at 206, 109 S.Ct. at 470.

In *Bennett v. New Jersey,* 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985), the Secretary had previously disbursed to New Jersey federal funding under Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 241a *et seq.* (1976), *repealed* Pub.L. No. 95–561, 92 Stat. 2200. After an audit, he claimed that New Jersey had allocated federal funding to the wrong schools in Newark and in 1976 exercised his right to recoup the misallocated funds. *Bennett,* 470 U.S. at 636–37, 105 S.Ct. at 1558–59. In 1978, while that action was pending before the Education Appeal Board, Congress changed Title I's substantive standards for determining whether funds had been misallocated. *Id.* at 637, 105 S.Ct. at 1559. As in *Bowen,* it was assumed that application of the 1978 amendment to the prior transaction would indeed be retroactive; the issue before the Court was thus whether the 1978 amendment should be so applied. *Id.* at 633–34, 105 S.Ct. at 1556–57. The Court therefore had no occasion in either case to address the issue in *Reynolds* and *Neild*—whether the statute was in fact retroactive.

We accordingly hold, on the continuing authority of *Reynolds v. United States,* 292 U.S. 443, 449, 54 S.Ct. 800, 803, 78 L.Ed. 1353 (1934), and *Neild v. District of Columbia,* 110 F.2d 246, 255 (D.C.Cir.

1940), that the Act and the regulations are not retroactive. *See also Alexander v. Robinson,* 756 F.2d 1153, 1155 & n. 5 (5th Cir.1985) (applying principle of these cases in holding that challenged food stamp regulation is not retroactive). In view of that conclusion, we need not consider AACS's argument that under *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), and *Gersman v. Group Health Ass'n, Inc.,* 975 F.2d 886 (D.C.Cir.1992), the Act does not speak with the requisite clarity to justify retroactive rulemaking.[1]

### III.

■ AACS next claims that the Act and the Secretary's regulations should be overturned because they are irrational. They are irrational, AACS explains, because they punish *schools* for their *students'* rates of default, over which schools have very limited control, by terminating school participation in the GSL program. Consequently, the Act and its implementing regulations violate substantive due process.

We disagree both with AACS's characterization of the CDR amendments to the GSL program and with its constitutional conclusion. It is obvious that Congress's intent in passing the Act was the plainly legitimate one of reducing the cost to the federal government of reinsuring defaulted student loans. By FY 1989, reinsuring such loans had cost the United States Treasury more than $2 billion. U.S. DEP'T OF EDUC., FY 1989 GUARANTEED STUDENT LOAN PROGRAMS DATA BOOK 72. AACS has offered nothing but rhetoric to impugn that benign legislative intention. We therefore reject the notion that Congress's intent was to punish schools with excessive CDRs; rather, much like a private lender, Congress merely refused to reinsure unusually large credit risks.

Moreover, the Act is rational. After a rather comprehensive evaluation of the GSL program, Congress found that the schools themselves bear a fair share of the blame for the rapid increase in GSL defaults. *See, e.g., Senate Report* at 11–13 (describing schools' abuses of GSL program). Even apart from that well-supported finding, we agree with the Secretary that it is clearly rational to solve the problem of increasing GSL defaults by eliminating schools evidencing a disproportionately large share of the defaults. Given the extremely limited scope of permissible judicial inquiry here, *see Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976); *Flemming v. Nestor,* 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960); *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955), the Act and the Department's regulations easily satisfy the substantive dictates of the Due Process Clause.

■ AACS's last substantive attack on the Act and the regulations is a contract claim under the Takings Clause. It argues that by taking away member schools' vested right, under the Program Participation Agreement, to remain eligible for participation in the GSL program, Congress and the Secretary have abrogated the Department's contracts with member schools. Urging that Congress and agencies exercising delegated congressional powers lack the power to abrogate contracts, AACS contends that both should be invalidated.

If it were apparent that Congress or its delegee had abrogated the schools' Program Participation Agreements, AACS would have a colorable argument. Congress cannot impair accrued contract rights or repudiate its debts. *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 55, 106 S.Ct. 2390,

---

1. We cannot let pass without comment the fact that AACS's initial brief quotes us as having held, in *Clark–Cowlitz Joint Operating Agency v. Federal Energy Regulatory Comm'n,* 826 F.2d 1074 (D.C.Cir.1987), *cert. denied,* 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988), that "[a]gencies possess no particular expertise on the issue of retroactivity, and reviewing courts in turn have 'no overriding obligation of deference' to an agency's decision to give retroactive effect to a new rule." AACS Br. at 31–32. In fact, we held no such thing—the quoted passage came from the *dissenting opinion. See* 826 F.2d at 1094 (Mikva, J., dissenting).

2398, 91 L.Ed.2d 35 (1986) ("*PAOTSSE*"); *Perry v. United States*, 294 U.S. 330, 350–54, 55 S.Ct. 432, 434–37, 79 L.Ed. 912 (1935); *Larionoff v. United States*, 533 F.2d 1167, 1179 (D.C.Cir.1976), *aff'd*, 429 U.S. 997 (1977). However, it is clear to us that neither Congress nor the Secretary has abrogated the Department's contracts with the schools. As we have already held, the Program Participation Agreement confers upon member schools no legally protectible interest in, or reasonable expectation of, continued eligibility for the GSL program. *See supra* p. 864.

 Moreover, even if it did, it was well within Congress's power to terminate the contracts. When the federal government enters into contracts with private parties, Congress *always* retains the power to alter the terms of the contract unless that right has been waived in " 'unmistakable terms.' " *PAOTSSE*, 477 U.S. at 52, 106 S.Ct. at 2395–96 (quoting *Merrion, v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982)). Such contracts "should be construed, if possible, to avoid foreclosing exercise of sovereign authority." *Id.* at 52–53, 102 S.Ct. at 2395–96. We join several of our sister circuits in holding that such a waiver has not been made under Program Participation Agreements pursuant to the GSL program. *See Rhode Island Higher Educ. Assistance Auth. v. Secretary, United States Dep't of Educ.*, 929 F.2d 844, 850–51 (1st Cir.1991); *Great Lakes Higher Educ. Corp. v. Cavazos*, 911 F.2d 10, 16 (7th Cir.1990); *Educational Assistance Corp. v. Cavazos*, 902 F.2d 617, 629 & n. 20 (8th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 246, 112 L.Ed.2d 205 (1990); *Ohio Student Loan Comm'n v. Cavazos*, 900 F.2d 894, 901–02 (6th Cir.1990); *South Carolina State Educ. Assistance Auth. v. Cavazos*, 897 F.2d 1272, 1275–76 (4th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 243, 112 L.Ed.2d 202 (1990). The Act and the implementing regulation, therefore, pass substantive constitutional muster.

## IV.

Having failed to win on substantive grounds, AACS seeks to prevail on procedural due process grounds. AACS claims that member schools' contract rights under the Program Participation Agreement constitute "property interests" and that they have a "liberty interest" in their reputation within the meaning of the Due Process Clause. By terminating certain member schools for having CDRs in excess of the Act's thresholds, the Secretary has deprived them of these interests. In order to do so consistent with the Constitution, AACS argues, due process requires the Department to give member schools notice of the CDR thresholds in the fiscal year to which the threshold applies so that they can attempt to conform their conduct to it. Because the Secretary has failed to give such notice here, AACS contends that he may not terminate its member schools.

The Secretary counters with the assertion that member schools have neither property nor liberty interests in continued GSL program participation because, in his view, recognizing such interests would impair the flexibility of the GSL program and no reputational harm is done in terminating schools with excessive CDRs. Even if member schools do have such interests, the Department's appellate procedures, 20 U.S.C. § 1085(a)(3), which provide an expeditious means of challenging in writing the correctness of its CDR calculations or the fairness of terminating a given school, satisfy the dictates of due process.

We regard AACS's self-styled due process argument as merely a reiteration of its retroactivity argument, which we rejected earlier in this opinion. Furthermore, given that AACS has not pressed a conventional procedural due process claim before us, we decline the Secretary's invitation to pass on the constitutionality of the termination procedures. If some future litigant develops a record genuinely raising the question whether the Secretary's appellate procedures fail to protect its interests or are likely to lead to erroneous decisions, that will be soon enough to determine the issue.

## CONCLUSION

The Department's regulations, like the Act it implemented, apply prospectively

**868**

only, even though they base future eligibility for participation in the GSL program on schools' past default rates. The Secretary's regulations are, at the very least, a permissible interpretation of the Act and therefore are ones we are bound to accept. *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Neither the Act, so construed, nor the regulations themselves abrogate participating schools' contracts with the federal government because the schools have no legally protectible interest in future participation in the GSL program. The decision of the District Court, accordingly, is

*Affirmed.*